# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| Terrance J. Johnson, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. 3:09-CV-385 |
| | ) | |
| State of Indiana & Indiana | ) | |
| Department of Correction | ) | |
| (Miami Correctional Facility) | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION & ORDER

This matter is before the Court on the Motion for Summary Judgment, filed by Defendants on October 8, 2010. (DE #21.) For the reasons set forth below, Defendants' Motion for Summary Judgment is **DENIED** and Plaintiff's claims remain pending.

Background

Terrance J. Johnson ("Plaintiff") alleges in his Complaint that he was discriminated against on the basis of his race, that he was subjected to a racially hostile work environment, and that he was retaliated against in violation of 42 U.S.C. section 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000e

*et seq.*[1] (Comp., ¶¶ 3 & 5; DE #1, pp. 1-2.) The State of Indiana and the Indiana Department of Correction, Miami Correctional Facility (collectively, "Defendants"), filed the instant Motion for Summary Judgment on October 18, 2010. (DE #21.) Plaintiff filed a Response on January 3, 2011. (DE #31.) Defendants filed their Reply on February 21, 2011. (DE #35.) The Motion is now fully briefed and ripe for adjudication.

DISCUSSION

The standards that generally govern summary judgment motions are familiar. Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corporation. v. Catrett*, 477 U.S. 317, 322–23 (1986). In other words, the record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In deciding a motion for summary judgment, a court must view all facts in the light most favorable

---

[1] This Court will analyze the claims under the same standard because, "[a]lthough section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical." *McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009).

to the nonmovant. *Anderson*, 477 U.S. at 255; *Trade Finance Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406 (7th Cir. 2009).

The burden is upon the movant to identify those portions of the "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes demonstrate an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (citing *Anderson*, 477 U.S. at 248).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original). *See also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an

essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate.[2]

Facts

Plaintiff, an African American, was employed as a Correctional Officer by the Indiana Department of Corrections ("IDOC") at the Miami Correctional Facility in Bunker Hill, Indiana, from May 7, 2007, until he was officially terminated on March 20, 2008. (Interrog. No. 2; DE #21-1, p. 4.) Prior to being officially terminated, Plaintiff was suspended without pay for thirty days pending dismissal on February 14, 2008, by Assistant Superintendent Sally Stevenson. (Letter from Stevenson; DE #21-9, pp. 1-2 & Aff. of Pl., ¶ 2; DE #32-1, p. 1.)

While working as a Correctional Officer for Defendants, Plaintiff was a member of the prison's Emergency Response Team ("E-Squad") for a period of time; as a member of the E-Squad, he was responsible for handling emergency situations like fights, stand-offs, disasters and riots. (Aff. of Pl., ¶ 3; DE #32-1, pp. 1-2.)

---

[2] In their Reply brief, Defendants cite to *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635 (7th Cir. 2008) in support of the position that the Court should refuse to consider the facts proposed by Plaintiff and enter summary judgment in favor of Defendants. The Court notes that the local rule described in *Ciomber* is more strictly defined than this Court's local rule. Furthermore, "[d]istrict courts have broad discretion to enforce and require strict compliance with their local rules. See *Elustra v. Mineo*, 595 F.3d 699, 710 (7th Cir. 2010) ("We defer to the district court's understanding of its own rules.")." *Benuzzi v. Board of Educ. of City of Chicago*, 647 F.3d 652, 655 (7th Cir. 2011). This Court, in its discretion, will accept Defendants' undisputed material facts but will also address the merits of the claims and will consider the facts set forth in Plaintiff's Response brief where appropriately supported.

Working overtime on the E-Squad allowed Plaintiff to earn extra money. (Resp.; DE #32, p. 2 & Aff. of Pl., ¶ 25; DE #32-1, p. 8.)

During the course of his employment, Plaintiff was supervised by various Sergeants, Lieutenants, Captains, Majors, and/or Superintendents. (Interrog. No. 2; DE #21-1, p. 4.) Plaintiff was initially positioned in the area known as the "yard" from approximately June 2007 to October 2007. (Aff. of Pl., ¶¶ 4-5; DE #32-1, p. 2.) Three of his specific supervisors during that time were Sergeant Bollins, Sergrant Wilcox, and Captain Truax, all of whom are Caucasian. (Aff. of Pl., ¶ 6; DE #32-1, p. 3.) While in the "yard," Plaintiff witnessed his supervisors engage in racially inappropriate behavior and make racially offensive comments on a regular basis. For example, in July or August of 2007, Plaintiff witnessed Sergeant Bollins chant the word "nigger" repeatedly to African American prisoners while conducting a sarcastic imitation of a rap song. (Comp., ¶ 5; DE #1, p. 2 & Aff. of Pl. ¶ 16, DE #32-1, p. 6.) Additionally, around that same time and in Plaintiff's direct presence, Sergeant Wilcox referred to the African American prisoners as "monkeys" and made racist jokes with regard to them. (Aff. of Pl., ¶ 9; DE #32-1, p. 4.) Plaintiff witnessed both Sergeant Bollins and Sergeant Wilcox using racist jokes and racial slurs in an attempt to provoke the African American prisoners into confrontations; the Sergeants also made racist jokes directly to Plaintiff. (Dep. of Pl., pp. 45-46; DE

#21-13, pp. 5-6.) These racially charged incidents happened at least three to four times a week while he was stationed in the "yard." (Dep. of Pl., pp. 45-46; DE #21-13, pp. 5-6 & Aff. of Pl., ¶ 13; DE #32-1, pp. 4-5.) Plaintiff found theses comments and jokes very offensive. (Aff. of Pl., ¶ 16; DE #32-1, p. 6.) While in the "yard," Plaintiff was frequently placed in "unnecessarily hazardous situations" by his fellow correctional officers, all of whom were Caucasian; he was left to break up large groups of inmates by himself which was extremely dangerous as well as stressful to Plaintiff. (*Id*. at ¶ 7; *Id*. at 3.) He was transferred from the "yard" to an "in-house" post in October of 2007. (*Id*. at ¶ 5; *Id*. at 2.) He describes the "in-house" position as more dangerous and less desirable than the "yard" position because of the ratio of guards to prisoners. (*Id*. at ¶ 4; *Id*. at 2.)

Plaintiff asserts that he was instructed by Sergeant Wilcox, Sergeant Bollins, and Captain Truax to target and harass African American prisoners by subjecting them to unfair treatment that was not similarly directed at Caucasian prisoners. (Aff. of Pl., ¶¶ 14-15; DE #32-1, pp. 5-6.) For example, Plaintiff was instructed to continually search African American prisoners and break them up whenever they congregated together, even if they were simply talking. (Aff. of Pl., ¶ 14; DE #32-1, p. 5.) He was also instructed to write African American prisoners up for non-existent

or petty violations. (*Id.*) He was not asked to do the same to Caucasian prisoners, nor did he see such things being done to them by other Caucasian employees. (*Id.*) Furthermore, he was ordered to frequently "shake down" the cells of African American prisoners; such "shake-downs" took place nearly every day of the week for African American prisoners while only sporadically for Caucasian prisoners. (Aff. of Pl., ¶ 15; DE #32-1, pp. 5-6.)

Plaintiff began dating a fellow employee named Shalana Graff,[3] a Caucasian female nurse at the hospital, in August of 2007. (Dep. of Pl., pp. 42-44; DE #21-13, pp. 2-4 & Aff. of Pl., ¶ 8; DE # 32-1, p. 3.) He asserts that his relationships with his supervisors soured significantly at this point because they objected to the interracial relationship. (Aff. of Pl., ¶¶ 8, 17; DE #32-1, pp. 3, 6 & Dep. of Pl., pp. 41-45; DE 21-13, pp. 2-5.) In support of this contention, Plaintiff states that while Sergeant Wilcox never directly told Plaintiff not to "date out of race" or asked him specifically about his relationship with Shalana Graff, he did make negative comments directly to Plaintiff about "little mixed kids" and the "interracial thing" such as the general assertion that "people should not mix races." (Aff. of Pl., ¶ 18; DE #32-1, pp. 6-7 & Dep. of Pl., pp. 44-45; DE #21-13, pp. 4-5.) In addition, during a meeting in September of 2007 at which Sergeant Wilcox was

---

[3] Shalana Graf is referred to by various names/spellings throughout the discovery documents; for purposes of this Order, the Court will refer to her as Shalana Graff as listed (most often) in the Plaintiff's Affidavit.

also present, Captain Truax advised Plaintiff that he should not date a co-worker, despite the fact that there was no specific policy against it. (Dep. of Pl., pp. 42-43; DE #21-13, pp. 3-4 & Aff. of Pl., ¶¶ 10, 17; DE #32-1, pp. 4, 6.)[4]

Plaintiff notified Human Resources Director, Joan Cooper, at least three times in 2007 (once in the summer and twice in December) about the various discriminatory remarks and treatment, but nothing was done to investigate or remedy the situation. (Interrog. No.'s 14-15, 17; DE #21-12, pp. 3-5 & Aff. of Pl., ¶¶ 21-22; DE #32-1, pp. 7-8.)

An employee fact file was kept for Plaintiff while he worked at the Miami Correctional Facility. (Emp. Fact File; DE #21-2.) In general, Plaintiff received many positive entries in his employee fact file up until his first written performance evaluation, which was based on a review period from May 7, 2007, through November 7, 2001. (*Id.* at 1-2 & Emp. Appraisal Report; DE #21-4.) The evaluation indicates that Plaintiff was "meeting

---

[4] Plaintiff also states that Officer Flick, a fellow officer and friend, informed him that, due to repeated questioning, Sergeant Wilcox was aware of the relationship between Plaintiff and Shalana Graff and that Sergrant Wilcox had told Officer Flick that he felt people "shouldn't date out of race." (Aff. of Pl., ¶¶ 8, 18; DE #32-1, pp. 3, 6 & Dep. of Pl., pp. 44-45; DE #21-13, pp. 4-5.) However, there is an obvious hearsay issue with these statements. Plaintiff has only cited to his own deposition testimony and Affidavit. The Court is unaware of any deposition testimony or statements made by Officer Flick in the record. Hearsay statements are not competent evidence that may be used to oppose a motion for summary judgment. *See Haywood v. Lucent Techs., Inc.,* 323 F.3d 524, 533 (7th Cir. 2003). Thus, this Court cannot consider these statements made outside of Plaintiff's presence in evaluating his claims.

expectations" for all ranked areas of performance. (Emp. Appraisal Report; DE #21-4.) However, after this first evaluation, the entries became more critical. (Emp. Fact File; DE #21-2, 2-4.) The employee fact file also contains notations of Plaintiff's days of missed work, both authorized and unauthorized. (*Id.*)

The following are relevant examples of entries in Plaintiff's file. On October 20, 2007, Plaintiff called into work requesting personal leave for three hours, but he only had one and one half hours of accrued time available. (Emp. Fact File; DE #21-2, p. 2 & Letter of Counseling; DE #21-3.) Because he did not have sufficient time accrued, he was assessed one and one half hours unauthorized leave and received a counseling letter. (*Id.*) A positive yet constructively critical entry of Plaintiff's work was noted on November 9, 2007, which stated that he was doing a "good job" and was a very professional officer with a lot of potential but that he needed to improve by: 1) monitoring radio traffic more closely; 2) being more professional and observant of surroundings; and 3) continuing to know policy. (Emp. Fact File; DE # 21-2, p. 2.) Plaintiff received a notation in his fact file on November 26, 2007, stating that he had made no logbook entries on November 4, 2007, and advising him that making logbook entries both accurately and legibly was important. (*Id.* at 3.) Another notation was made on December 16, 2007, advising him to "remain alert, observant, and less distracted by offenders" and to "refrain from excessive

conversations that are not work related." (*Id.*)  He requested a transfer out of the Miami Correctional Facility in December of 2007, but this request was denied by the Human Resources Director, Joan Cooper.  (Aff. of Pl., ¶ 23; DE #32-1, pp. 7-8.)

Plaintiff's first annual written performance evaluation was done for the period of May 7, 2007, to December 31, 2007, in which his overall rating was "Does Not Meet Expectations."  (Annual Emp. Appraisal Report; DE #21-5, p. 2.)  The evaluation was signed by the evaluator and reviewer on December 21, 2001.  (*Id.* at 3.)  It explains that, while only being at the Miami Correctional Facility for seven months, Johnson was "very aware of his job duties and falls short in that area."  (*Id.*)  The evaluation also refers to a written reprimand received by Plaintiff on December 14, 2007, for dereliction of duty and neglect of duty as a partial explanation for his overall rating.  (*Id.* at 1.)  However, the Court notes that such written reprimand is not provided in the record by either party, and it is not noted in Plaintiff's employee fact file.

Following the annual performance evaluation, Plaintiff received a written reprimand from Lt. Earl Edwards for requesting personal time on January 2, 2008, when he had 0 hours of personal time available.  (Written Reprimand; DE #21-6 & Emp. Fact File; DE #21-2, p. 3.)  The reprimand states that further violations could "result in a more severe disciplinary action" but that he was entitled to appeal the reprimand.  (Written Reprimand; DE #21-6.)

On January 8, 2008, Plaintiff entered the visitor processing area without his State ID badge and was given a written reprimand for violating IDOC and Miami Correctional Facility policies characterized as insubordination, conduct unbecoming staff and facility entrance and exit procedure. (Emp. Fact File; DE #21-2, p. 3 & Results of Pre-Deprivation Letter; DE #21-9, p. 1.) However, Plaintiff was aware of other similarly situated correctional officers (including one such officer in front of him in line on January 8th) who forgot their ID badges and were only verbally warned, not disciplined or reprimanded; these other officers were white. (Interrog. No's 18-21; DE #21-12, pp. 6-7 & Aff. of Pl.; DE #32-1, p. 9.) Shortly thereafter, via a memorandum,[5] Lieutenant Douglas Nelson requested that Plaintiff be removed from the E-Squad because of his "attitude, demeanor, and attendance" based on three factors: 1) he did not show up for a PT Test on December 19, 2007, which would have made him an active member of the E-Squad if he passed; 2) he had a Letter of Reprimand and a recent Request for Administrative Action on file; and 3) on January 8, 2008, he was involved in an argument with a fellow E-Squad member during the forgotten State ID badge incident described above. (Inter-Dept. Memo; DE #21-7.)

Plaintiff's employee fact file indicates that he missed work

_____

[5] The Court notes that the while the memorandum is dated January 6, 2008, one of the incidents cited in support of Plaintiff's removal from the E-Squad did not take place until two days after the date of the memorandum.

and was carried unauthorized leave on the 13th, 16th, 17th, 21st, 22nd, 25th, 26th, 27th , 30th, and 31st of January and on the 4th, 5th, and 8th of February in 2008.  (Emp. Fact File; DE #21-2, pp. 3-4.)  The file indicates that he called in on the days he was going to be out up until January 21, 2008, but that he was a no call/no show from January 22, 2008 through February 8, 2008.  (*Id.*)  Plaintiff, however, states that he in fact did call in until the very end of January of 2008.  (Aff. of Pl., ¶ 27; DE #32-1, p. 9.)

The stress of Plaintiff's working environment and fears for his safety caused him to seek medical attention and begin a "medical leave" of absence in mid-January. (Aff. of Pl., ¶ 26; DE #32-1, p. 8.)  He obtained two doctor's notes from Milton M. Morgan, M.D., which he faxed to Defendants.  (Dr. Notes; DE #32-5 & Aff. of Pl., ¶ 27; DE #32-1, p. 9.)  The first note, dated January 15, 2008, states that Plaintiff is "suffering from job related stress and needs 3 wks off work - starts 1/13/08." (Dr. Notes; DE #32-5, p. 1.)  The second note, dated February 4, 2008, states that Plaintiff is "still unable to work needs an additional 3 wks off - has stress." (*Id.* at 2.)  Plaintiff asserts that he spoke with the Human Resources Director, Joan Cooper, prior to taking his medical leave and was told he would receive Family Medical Leave Act ("FMLA") and Short Term Disability ("STD") paperwork to fill out but that the paperwork was never sent to him. (Aff. of Pl., ¶ 27; DE #32-1, pp. 8-9.)  Both parties agree that

Plaintiff was not eligible under the FMLA because he had not been employed by a state agency for an aggregate of twelve months. (FMLA Denial Form; DE #21-10 & Resp.; DE #32, p. 7.) However, STD may have been available to him if properly authorized by Defendants. Defendants claim that they provided the STD paperwork to Plaintiff on January 23, 2008 both "in person and via U.S. mail"[6] but that Plaintiff did not return it. (MSJ Memo.; DE #22, p. 5 & STD Checklist; DE #21-11.) Plaintiff, on the other hand, asserts that he never received the necessary STD paperwork. (Aff. of Pl., ¶ 27; DE #32-1, p. 8.) Plaintiff also states that he was never advised of the Leave Without Pay policy which would have "permitted [him] to continue [his] job status while on leave." (*Id.*) The applicable policy states:

> Authorized leave without pay is available to you as a state employee whenever such leave is deemed to be in the best interest of the State. The leave request should be submitted in writing and requires written approval by the approving authority within your agency and the State Personnel Director. Although you retain your job status, no pay or other benefits are received during this leave.

(Leave Without Pay Policy; DE #32-7.) Plaintiff states that he kept Defendants apprised of his medical situation until the very end of January 2008, when a "night shift control sergeant

---

[6] The Court notes that Plaintiff's employee fact file indicates that he did not work on January 23, 2008, or any day after that. (Emp. Fact File; DE #21-2, p. 4.) The Court also notes that the top of the STD Checklist form has a handwritten notation of "mailed 1-23-08" with another notation of "handed" crossed out. (STD Checklist; DE #21-11.) Therefore, it is highly unlikely that he received this document in person as Defendants claim.

eventually told [him] that [he] didn't need to keep calling in anymore, since [he] had provided doctor statements, and was listed already as being on leave." (Aff. of Pl., ¶ 27; DE #32-1, p. 9.)

A notice of pre-deprivation meeting was mailed to Plaintiff on January 22, 2008, informing him that a pre-deprivation meeting was scheduled for January 31, 2008. (Notice; DE # 21-8.) Plaintiff acknowledges that he was made aware of the scheduled pre-deprivation meeting; however, he claims that, because he was still on "medical leave" he spoke with Joan Cooper of the Human Resources Department and asked if the meeting could be rescheduled; he never received a phone call back with an update or a rescheduled date. (Aff. of Pl., ¶ 31; DE #32-1, p. 10.) The meeting was held in Plaintiff's absence, and a letter from Assistant Superintendent of Operations Sally Stevenson was sent to Plaintiff on February 14, 2008, detailing the results of the pre-deprivation meeting and suspending Plaintiff for thirty days pending dismissal. (Letter from Stevenson; DE #21-9, pp. 1-2.)


Hostile Work Environment

Title VII of the Civil Rights Act of 1964 states, in part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or

-14-

national origin." 42 U.S.C. § 2000e-2(a)(1). To establish a hostile work environment claim under Title VII, a plaintiff must show: (1) that his work environment was both objectively and subjectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability. *Chaney v. Plainfield Healthcare Center*, 612 F.3d 908, 912 (7th Cir. 2010). The context of the workplace in its entirety must be taken into account when assessing whether a hostile work environment exists. *Id.*

In this case, it is not specifically disputed that there is a basis for employer liability.[7] While Defendants do appear to

---

[7] In order to establish a basis for employer liability, a plaintiff must either show (1) that the hostile work environment was created or exacerbated by his supervisors or (2) that his employer was "negligent in discovering or remedying harassment by his coworkers." *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010) (citing *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 848 (7th Cir. 2008). In the context of racial harassment cases, "[a] supervisor is someone with the power to directly affect the terms and conditions of the plaintiff's employment." *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004). The word supervisor is "a term of art that denotes more than an individual with a higher rank, a superior title, or some oversight duties. . . . [Even a person with] extensive duties—such as the combination of directing or managing a plaintiff's activities, providing evaluation input to a plaintiff's supervisor, and training a plaintiff—do not necessarily suffice." *Id.* To establish employer liability based on the actions of a plaintiff's co-workers, a plaintiff must show that he made a "concerted effort to inform [his employer] of the racial harassment he was allegedly experiencing or that the harassment was sufficiently obvious to put [his employer] on constructive notice." *Id.* at 391.

Although Defendants do not specifically address this prong of the hostile work environment claim in their Motion for Summary Judgment, Plaintiff points out in his Response brief that there is a basis for Defendants' liability based on the fact that his "coworkers, plus supervisors and other superiors" harassed him. In fact, he states that the "majority of the racially harassing conduct was committed by [Plaintiff's] superiors." Defendants admit that Plaintiff was "supervised by various Sergeants, Lieutenants, Captains, Majors, and/or Superintendents." Plaintiff states that some of those specific supervisors were Sergeant Bollins, Sergrant Wilcox, and

-15-

dispute that the harassment was based on Plaintiff's membership in a protected class,[8] they misunderstand this element.  Plaintiff, an African American, has presented evidence that the conduct in question centers around issues of race and that such conduct affected him directly.  As explained in more detail below, a plaintiff need not be the subject of the hostile conduct if he is in the "target area." *Yuknis v. First Student, Inc.*, 481 F.3d 552, 554 (7th Cir. 2007).

Therefore, for purposes of this order, the Court finds that only the objective and subjective offensiveness and the severity and/or pervasiveness of the conduct described are disputed.[9]

> In evaluating the severity and pervasiveness of the conduct, we examine all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating,

---

Captain Truax, and he proceeds to describe conduct attributable to them. However, neither side presents specific evidence regarding the exact oversight duties and/or powers of those supervisors.

In any event, the Court notes that Plaintiff has presented evidence that he notified the Human Resources Department several times of the harassing comments and treatment and that nothing was done to address the situation. Viewing these facts in a light most favorable to Plaintiff, at the very least, there is a sufficient basis to find that Defendants were negligent in remedying the harassment by coworkers and/or supervisors, and this prong of the hostile work environment claim has thus been met for summary judgment purposes.

[8]  In their Motion for Summary Judgment and Reply brief, Defendants argue that there is no evidence that "*he* [Plaintiff] was subjected to a hostile work environment because of his race" (emphasis in original) or that "he was the subject of racial jokes; he does not allege that his superiors called him any racial epithet or said anything to him about his race.  It was the offenders, not the plaintiff, who were allegedly harassed."

[9]  The Court notes that in their Motion for Summary Judgment and their Reply brief Defendants do not specifically break out these elements; the elements are closely intertwined.

> or a mere offensive utterance; and whether it
> unreasonably interferes with an employee's
> work performance. Ultimately, to satisfy the
> severe or pervasive prong, the plaintiff must
> show that the work environment was both
> subjectively and objectively offensive. In
> other words, the environment must be one that
> a reasonable person would find hostile or
> abusive, and one that the victim in fact did
> perceive to be so.

*Smith v. Northeastern Illinois University*, 388 F.3d 559, 566 (7th

Cir. 2004) (internal quotation marks and citations omitted). In

*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81-82,

the Supreme Court emphasized that the "social context" in which the

harassment occurs must be considered when determining the objective

severity of the harassment and that the evidence should be viewed

"from the perspective of a reasonable person in the plaintiff's

position." The Supreme Court recognized, for example, that a slap

on the buttocks by a football coach to his player as he takes the

field must be viewed differently than the same type of slap

committed by a coach to his secretary while in his office. *Id*. at

81. According to the Supreme Court,

> [t]he real social impact of workplace behavior
> often depends on a constellation of
> surrounding circumstances, expectations, and
> relationships which are not fully captured by
> a simple recitation of the words used or the
> physical acts performed. Common sense, and an
> appropriate sensitivity to social context,
> will enable courts and juries to distinguish
> between simple teasing or roughhousing . . .
> and conduct which a reasonable person in the
> plaintiff's position would find severely
> hostile or abusive.

*Id.* at 81-82.

Plaintiff has adequately alleged he subjectively perceived his work environment to be hostile or abusive.  He offers an Affidavit stating that he found the racist "jokes" and comments to be "very offensive."  He also complained to the Human Resources Director at least three times about the discriminatory conduct, and he requested a transfer to a different facility because of such conduct.  Plaintiff describes how the environment caused him stress and that he had fears for his safety.  Finally, he sought medical treatment and received a doctor's note stating that he had job related stress.

The more complicated analysis is whether Plaintiff has presented evidence to show that his work environment was objectively hostile and severe and/or pervasive.  Defendants' primary argument is that, because the harassment was not specifically directed at Plaintiff, a hostile work environment did not exist.  Defendants rely on *Smith v. Northeastern Illinois University*, 388 F.3d 559, 567 (7th Cir. 2004) for this assertion.  In *Smith*, the district court dismissed one of the plaintiff's[10] hostile work environment claims; the Seventh Circuit agreed with the district court that the plaintiff did not show that her work environment was objectively hostile, mainly because the harassment

---

[10] There were several plaintiffs in the *Smith* case; this section refers to plaintiff Weaver.

was not directed at her. *Id*. at 566. The Seventh Circuit noted that, although her clerical staff told her they overheard one of the defendants use the terms "motherfucking black niggers" or "motherfucking niggers" numerous times, she personally had only overheard the defendant say "black motherfucker" one time throughout her many years as an employee and it was not said in reference to her. *Id*. at 566-67. The Seventh Circuit stated that "[w]hile certainly relevant to the determination of a hostile work environment claim, when harassment is directed at someone other than the plaintiff, the impact of such harassment is obviously not as great as the impact of harassment directed at the plaintiff." *Id*. at 567 (internal quotation marks and citations omitted). However, not all "second-hand" harassment was precluded by Smith, and the Seventh Circuit specifically pointed out that "[w]e do not mean to hold that a plaintiff can never demonstrate a hostile work environment through second-hand comments or in situations where a plaintiff is not the intended target of the statements." *Id*.

Indeed, Defendants (or Plaintiff for that matter) fail to mention a more recent case wherein the Seventh Circuit cautions against describing second-hand harassment as "categorically less serious" than harassment aimed directly at a plaintiff. See *Yuknis v. First Student, Inc*., 481 F.3d 552, 554 (7th Cir. 2007). *Yuknis* makes it clear that "target area" harassment, in the correct context, is actionable and that "a belittling term like 'second

hand' . . . has no analytic function and is better avoided." *Id.*
554-55. The Seventh Circuit stressed:

> [t]he fact that one's coworkers do or say
> things that offend one, however deeply, does
> not amount to harassment if one is not within
> the target area of the offending conduct-if,
> for example, the speech or conduct is
> offensive to women and one is a man, or
> offensive to whites and one is a black. One
> could *be* the target, as the plaintiff was in
> the two incidents we mentioned, and it was
> targeting that the Supreme Court seems to have
> had in mind in *Meritor Savings Bank v. Vinson*,
> 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49
> (1986), when it spoke of a worker's 'right to
> work in an environment free from
> discriminatory intimidation, ridicule, and
> insult.' Or one could be in the target *area*
> because a group of which one was a member was
> being vilified, although one was not singled
> out. . . .
>
> In suggesting the alternative term 'target
> area,' we do not mean to suggest that there
> must be an intention of causing distress or
> offense. A working environment may be deeply
> hurtful to women even though the men who
> created it were merely trying to please
> themselves, and were thus guilty of
> insensitivity rather than aggression. The
> darts were aimed elsewhere, and hit the women
> by accident. But if as in this case the
> charge is the creation of a working
> environment hostile to women, the conduct must
> be the kind that makes the workplace
> uncomfortable for women, as distinct from
> making it uncomfortable for cat lovers, for
> people who are disgusted by coworkers who
> violate work rules by selling Avon products at
> work, for people offended by adultery, for
> gamblers, and for fastidious people, who abhor
> foul language. The point is elementary: the
> creation of a hostile working environment is
> actionable under Title VII only when the
> hostility is to a group (or specific members
> of a group), such as women, whom the statute

protects.

*Id.* at 554 (internal citations omitted; emphasis in original).

Here, the record indicates that Plaintiff, an African American, personally witnessed his supervisors make racially offensive comments and jokes on a regular basis. For example, he witnessed Sergeant Bollins chant the word "nigger" repeatedly to African American prisoners in the summer of 2007. Around that same time, Sergeant Wilcox referred to the African American prisoners as "monkeys" in Plaintiff's direct presence. Plaintiff witnessed both Sergeant Bollins and Sergeant Wilcox using racist jokes and racial slurs in an attempt to provoke the African American prisoners into confrontations. According to Plaintiff, such racially charged incidents happened at least three to four times a week. He also claims that his supervisors instructed him to target and harass African American prisoners but not Caucasian prisoners. Finally, he states that his relationship with his supervisors soured significantly after they learned that he had begun dating a fellow employee who was Caucasian; he makes mention of negative comments directed to him about "little mixed kids" and the "interracial thing" such as the general assertion that "people should not mix races." He was advised by Captain Truax that he should not date a co-worker, despite the fact that there was no specific policy

against it.[11]

The Court declines to enter summary judgment on the hostile work environment claim.  The conduct described clearly places Plaintiff within the target area of the harassment.  The repeated use of the racial "jokes" and slurs in Plaintiff's presence, even though not directed at Plaintiff, is objectively offensive and likely altered the conditions of the working environment.  See *Chaney v. Plainfield Healthcare Center*, 612 F.3d 908, 912 (7th Cir. 2010) ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as "nigger" by a supervisor in the presence of his subordinates.") (citing *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)).  Added to these "jokes" and slurs is the fact that Plaintiff claims he was required to specifically target and harass inmates of his own race but not Caucasian inmates.  The Court agrees with Plaintiff in his assessment that:

> [a]s a correctional officer, [Plaintiff] was a
> member of law enforcement, an historically

_____

[11] As to the information in the foregoing paragraph, Defendants, in their Reply brief, seemingly argue that the information in Plaintiff's Affidavit should be disregarded because it is "self-serving."  However, the Seventh Circuit has recently used strong language in hopes of burying the "misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment because it is 'self-serving.'  If based on personal knowledge or firsthand experience, such testimony can be evidence of disputed material facts."  *Berry v. Chicago Transit Authority*, 618 F.3d 688, 691 (7th Cir. 2010) (internal citation omitted).  The Court notes that it "is not for courts at summary judgment to weigh evidence or determine the credibility of such testimony; we leave those tasks to the fact finders."  *Id.*

> honorable league of individuals who's job is
> built around the concept of honest and
> unbiased enforcement of rules for the
> protection of those under their guard and
> care. Arbitrarily targeting one group based
> on race, for hyper-scrutiny and false
> allegations is the antithesis of this ideal,
> particularly when the targeted group is of
> one's own race.

(Resp.; DE #32, p. 12.) Considering the contours of a correctional officer's job, this requirement seems likely to change the conditions of employment just as quickly as the use of a racial epithet. See *Chaney,* 612 F.3d at 912 (the entire context of the workplace must be taken into account when assessing whether a hostile work environment existed). And, the directive not to date a co-worker who happened to be Caucasian (despite the fact that there was no specific policy against it) coupled with the negative comments from his supervisors regarding "little mixed kids" and the "interracial thing," is objectively offensive when viewed in the entire context of the workplace.

Finally, while Defendants argue that the remarks and behavior described above were "isolated incidents," the Court finds that Plaintiff, through his Affidavit, has adequately alleged he witnessed racially offensive conduct and language by his supervisors on a near daily basis in the relatively short time he worked for Defendants.[12] Plaintiff is correct in noting that the

---

[12] Again, the Court notes that it "is not for courts at summary judgment to weigh evidence or determine the credibility of such testimony; we leave those tasks to the fact finders." *Berry v. Chicago Transit Authority*, 618

harassment does not need to be both severe and pervasive to be actionable. See *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999) ("the Supreme Court has repeatedly said, using the disjunctive 'or,' that a claim of discrimination based on the infliction of a hostile working environment exists if the conduct is 'severe or pervasive'") (citations omitted)).

Based on the foregoing and viewing the facts in the light most favorable to the non-movant, a reasonable jury could find that Plaintiff was subjected to a racially hostile work environment; thus, Defendants' Motion for Summary Judgment as to the hostile work environment claim is **DENIED**.

Retaliation

Title VII prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful practice by this subchapter. . . ." 42 U.S.C. § 2000e-3(a). Retaliation occurs under Title VII if an employee makes an effort to oppose discrimination and their employer subsequently takes an adverse action against them for doing so. *Smith v. Northeastern Illinois University*, 388 F.3d 559, 567 (7th Cir. 2004). Retaliation can be shown by either the direct or indirect method. *Id*. Under the direct method, which Plaintiff has chosen to utilize, he must show: (1) that he participated in an activity

F.3d 688, 691 (7th Cir. 2010).

protected by statute; (2) that his employer then took a materially adverse action against him; and (3) that there was a causal connection between the two events. *Benuzzi v. Board of Educ. of City of Chicago*, 647 F.3d 652, 664 (7th Cir. 2011). These elements may be shown by using direct or circumstantial evidence. See e.g. *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 673 (7th Cir. 2011). The Seventh Circuit has long used the phrase "convincing mosaic" to describe a type of circumstantial evidence that is often utilized in Title VII cases. See *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994) (it is a "kind of circumstantial evidence . . . that consists of ambiguous statements, suspicious timing, discrimination against other employees, and other pieces of evidence none conclusive in itself but together composing a convincing mosaic"). However, the Seventh Circuit has also noted that the difference between direct and circumstantial evidence is vague and that not every case must have a "mosaic-like character" to avoid summary judgment. *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903-04 (7th Cir. 2006). It is enough if a plaintiff can "prove by means of circumstantial evidence that he engaged in protected activity . . . and as a result suffered the adverse employment action of which he complains." *Id.* at 902 (quotation marks and citation omitted). Once a plaintiff has established these elements using the direct method of proof:

the burden of production shifts to the defendant to prove by a preponderance of the evidence that the same action would have occurred in the absence of the protected conduct. The persuasiveness of the defendant's explanation is normally for the finder of fact to assess, unless the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point. Summary judgment should be granted only if the defendant presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had no retaliatory motive.

*Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) (internal quotation marks and citations omitted).

Materially adverse action in retaliation claims has been construed broadly. *Smith*, 388 F.3d at 568. While not every change that causes an employee to be unhappy is considered materially adverse, the concept is "not limited solely to loss or reduction of pay or monetary benefits. It can encompass other forms of adversity as well." *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996) (citing *Collins v. State of Illinois*, 830 F.2d 692, 703 (7th Cir. 1987)). Such changes can even include things like "put[ting] the complainant in a more unfriendly working environment: actions like moving the person from a spacious, brightly lit office to a dingy closet, depriving the person of previously available support services (like secretarial help or a desktop computer), or cutting off challenging assignments." *Knox v. State of Ind.*, 93 F.3d 1327, 1334 (7th Cir. 1996). However, the

changes must be viewed in the context of the entire workplace, and "[i]t all depends on how much of a change, and how disadvantageous a change, took place." *Sitar v. Indiana Dept. of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003). In general, "'[m]aterially adverse actions' are those that might dissuade a reasonable employee from engaging in protected activity . . . [and] this category sweeps more broadly than the 'adverse employment actions' required to sustain a discrimination claim." *Benuzzi*, 647 F.3d at 665 (citing *Thompson v. N. Am. Stainless, LP*, ---U.S. ----, 131 S.Ct. 863, 868, 178 L.Ed.2d 694 (2011); *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)).

Causal connection is often the most difficult element for a plaintiff to prove in a retaliation case. *Benuzzi*, 647 F.3d at 665. Suspicious timing may be used to substantiate causality, but, standing alone, it is rarely enough to defeat summary judgment unless the materially adverse action follows immediately on the heels of the employee's engagement in a protected activity. See *Id*. at 665-66; see also *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009). Suspicious timing can be an "ally" to plaintiffs, but it is not the end-all-be-all. *Davis v. Time Warner Cable of Southeastern Wisconsin, L.P.*, --- F.3d ----, 2011 WL 2611303, *9 (7th Cir. July 5, 2011). Because "[s]uspicious timing may be just that—suspicious," context is extremely important in determining "whether an inference of causality is warranted or

not." *Id.* (citation omitted). Indeed, the Seventh Circuit has noted that suspicious timing is simply evidence of causality, and "thus there will be cases in which a plaintiff can demonstrate causation despite a substantial time lag." *Lalvani v. Cook County., Ill.*, 269 F.3d 785, 791 (7th Cir. 2001). A causal link may also be shown by establishing that "the protected conduct was a substantial or motivating factor in the employer's decision. . . . A motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions." *Culver*, 416 F.3d at 545. Finally, this link can be proven using circumstantial evidence "if the trier of fact can *infer* intentional discrimination." *Id*. 545-46 (emphasis in original).

Here, as to the first prong, Plaintiff claims he engaged in statutorily protected activity when he complained about the racially offensive and harassing conduct, retaliation, and discrimination (described in detail in the hostile work environment section above) to the Human Resources Department in the summer of 2007 and at least twice in December of 2007. Defendants appear to argue that, because Plaintiff has not provided exact dates as to when he submitted his complaints, he has not shown that he engaged in any statutorily protected activity.[13] The Court disagrees.

---

[13] Defendants state that Plaintiff "cannot prove retaliation if he cannot establish when he even made a complaint." (Reply; DE #35, p. 10.)

While, as discussed below, timing can be applicable to determining causation in a retaliation case, there is no requirement under the law that a plaintiff must provide exact dates as to when he engaged in the statutorily protected activity. Plaintiff has provided a general time frame of the conduct and has described subsequent complaints to the Human Resources Department; his Affidavit when read in conjunction with his responses to the Interrogatories provide the necessary context. Plaintiff has adequately shown he engaged in protected activity for purposes of his retaliation claims. See *Davis v. Time Warner Cable of Southeastern Wisconsin, L.P.*, --- F.3d ----, 2011 WL 2611303, *8 (7th Cir. July 5, 2011) ("we have held that [even] an informal complaint may constitute protected activity for purposes of retaliation claims") (internal quotation marks and citation omitted).

As to the second prong, Plaintiff asserts that he suffered materially adverse actions when: (1) he was transferred from the "yard" to the more dangerous and less desirable "in-house" position in October of 2007; (2) he was removed from the E-Squad in early January of 2008 which caused him to lose possible overtime pay benefits; and (3) he was suspended in February of 2008 and then terminated. While Defendants do not dispute that Plaintiff's removal from the E-Squad and later suspension and termination were materially adverse actions, they do argue that his transfer from the "yard" to the "in-house" position was not significant enough to

constitute a materially adverse action. Again, the Court disagrees. Plaintiff has presented evidence, through his Affidavit, that being posted inside was much more dangerous than being posted in the "yard." The Court agrees with Plaintiff that it is possible that a trier of fact could conclude a reasonable employee would be dissuaded from complaining of discriminatory conduct if he thought it would result in him being transferred to a less desirable and significantly more dangerous position. Therefore, the Court finds that Plaintiff has shown the actions described above were materially adverse for purposes of his retaliation claims. See *Benuzzi*, 647 F.3d at 665.

Finally, Plaintiff argues that he has presented sufficient circumstantial evidence to show a causal connection between the protected activities and the materially adverse actions. First, Plaintiff argues that the timing between his complaints to the Human Resources Department and all of the materially adverse actions taken against him was suspicious. He notes that his transfer from the "yard" to the "in-house" position occurred approximately two months after his first complaint was made to the Human Resources Department in August of 2007.[14] He further points

_____

[14] Plaintiff argues in his Response Brief that he made this complaint in August; however, the Court notes that the record is less clear than Plaintiff asserts. Nonetheless, his Affidavit can be used to establish that he did not begin working in the "yard" until June of 2007 and that the incident regarding Sergeant Bollins chanting rap songs and using the word "nigger" over and over occurred in July or August of 2007. His answers to the Interrogatories indicate that this incident, as well as the incident involving Sergeant Wilcox telling Plaintiff to "go break up the monkeys" occurred in the

out that his removal from the E-Squad occurred mere weeks from the complaints he made in December of 2007 and that his ultimate suspension and termination were only approximately two months later. The Court notes that none of the materially adverse actions follow immediately "on the heels" of Plaintiff's complaints. Therefore, he will need more to establish the requisite causal connection.

Plaintiff provides the following as additional circumstantial evidence from which, he argues, a reasonable trier of fact could infer retaliatory discrimination was the reason for the materially adverse actions: (1) subsequent to his complaint to the Human Resources Department in August of 2007, he was subjected to additional racial harassment by his supervisors related to his relationship with a Caucasian employee; those supervisors made comments to him regarding the "interracial thing," "little mixed kids," and the general assertion that "people should not mix races" and then called a meeting in September of 2007 to warn him not to date his coworker; (2) his fact file, which had previously contained only glowing comments, began accumulating negative comments thereafter;[15] (3) following his complaints to the Human

_____

"summer of 2007" and that he made his first complaint to the Human Resources Department shortly thereafter. Giving Plaintiff the benefit of the inferences to which he is entitled at this stage, the Court finds it reasonable to conclude that this complaint was made in August of 2007.

[15] The Court notes that, after his complaint to the Human Resources Department in August of 2007, Plaintiff continued to receive mainly positive comments until November 26, 2007. He was transferred to the "in-house"

Resources Department in December of 2007, his request to transfer to another prison was denied by the Human Resources Director, Joan Cooper; (4) although he requested FMLA and STD paperwork prior to taking his "medical leave" in January of 2008, according to the evidence most favorable to Plaintiff, Human Resources Director, Joan Cooper, did not submit such paperwork to him or provide him with any information regarding the Leave Without Pay policy, which would have allowed him to continue his job status while on leave; (5) after he received a notice in the mail that his pre-deprivation hearing was scheduled for January 31, 2008, he spoke with Human Resources Director, Joan Cooper, and requested that the meeting be rescheduled because he was still on "medical leave;" however, he never received a call back with a new hearing date, and the hearing took place in his absence. Plaintiff claims that these events, when viewed in totality and as an ongoing pattern following his complaints to the Human Resources Department, form a "complete picture" from which a reasonable trier of fact could conclude that Plaintiff was retaliated against for complaining to the Human Resources Department about the discriminatory conduct.

Defendants, on the other hand, argue that Plaintiff's circumstantial evidence fails to establish a causal connection because his responses are "hopelessly vague" about the specifics

_____

position in October of 2007. Therefore, this link, in and of itself, is very attenuated. However, the Court will view this piece of circumstantial evidence as part of a pattern of overall events.

and timing of his complaints to the Human Resources Department. They also assert that a number of "intervening factors" break the chain of causation between the complaints and the materially adverse actions, namely that Plaintiff received a written reprimand for unauthorized leave on January 2, 2008, that on January 8, 2008, he forgot his State ID badge and subsequently became upset and argumentative with fellow officers, and that he then failed to come to work without a valid excuse.

As the Court has previously noted, the lack of specificity as to the details and timing of the complaints to the Human Resources Department do not serve to destroy causality. A general time frame has been established, and the details of the case and the circumstantial evidence described above provide the necessary context. While timing alone is not enough, Plaintiff has also shown a subsequent pattern of events linking the materially adverse actions together. When viewing these facts through a logical chain of inferences, a reasonable trier of fact could conclude that Plaintiff's complaints to the Human Resources Department were a motivating factor for the subsequent actions and thus constituted impermissible retaliation. See *Culver*, 416 F.3d at 545.

Although Defendants are correct in noting that "intervening factors" clearly exist in the record, the Court is not convinced that the events described above *necessarily* break the chain of causality. Plaintiff has presented evidence in rebuttal, which if

believed, may refute Defendants' assertion that there are "sufficient reasons supporting the decisions" made with respect to Plaintiff. For example, although Defendants argue that Plaintiff's failure to bring his State ID badge to work was an "intervening factor," Plaintiff has pointed out that other similarly situated Caucasian correctional officers (including one such officer in front of him in line on January 8, 2008) also forgot their State ID badges but were only verbally warned and not disciplined or reprimanded. He also points to evidence which, if believed, shows suspicious conduct on the part of the Human Resources Department as it relates to his "medical leave" and absences from work (i.e. that the Human Resources Director, Joan Cooper, did not send him the requested paperwork or advise him of his unpaid leave options). Finally, Plaintiff has asserted that he was not able to defend his conduct or absences at his pre-deprivation hearing because the Human Resources Director, Joan Cooper, never called him back to reschedule the hearing.

Defendants will be free to argue to a trier of fact that the "intervening events" prove that the materially adverse actions would have been taken regardless of whether Plaintiff had ever complained to the Human Resources Department; however, as the Court cannot determine definitively that a reasonable trier of fact would be "compelled to credit the employer's case on this point," summary judgment cannot be granted. See *Id*. at 546 ("Summary judgment

should be granted only if the defendant presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had no retaliatory motive.")[16] While the Court does not suggest that the required causal link has been definitively shown by a preponderance of the evidence, the facts presented are enough to allow Plaintiff to survive summary judgment at this stage. See *Burnell v. Gates Rubber Co*., 647 F.3d 704, 710 (7th Cir. 2011). Summary judgment is therefore **DENIED** as to Plaintiff's retaliation claims.[17]

Discrimination

Title VII prohibits employers from firing or otherwise discriminating "against any individual with respect to his

---

[16] The Court notes that this case is distinguishable from *Davis v. Time Warner Cable of Southeastern Wisconsin, L.P.*, --- F.3d ----, 2011 WL 2611303, *9 (7th Cir. July 5, 2011). In *Davis*, there was no doubt that the intervening event (referred to in the opinion as the "elephant in the room") served to destroy causation between the protected activity and the materially adverse actions; there, the plaintiff engaged in a transaction violating the defendant's unambiguous zero-tolerance policy which, as unrebutted evidence showed, was strictly enforced regardless of an employees race. *Id*.

[17] Neither party fully develops arguments related to which particular decisionmaker was responsible for which particular materially adverse action. The Court notes that the transfer from the "yard" to the "in-house" position appears to have been decided by Captain Truax, the removal from the E-Squad position appears to have been made by Dana Hewitt, E-Squad Commander, and the ultimate suspension and termination appear to have been made by Sally Stevenson, Assistant Superintendent of Operations. The Seventh Circuit recognizes that a non-decisionmaker's illegal animus can infect a decisionmaker. *Schandelmeier-Bartels v. Chicago Park Dist*., 634 F.3d 372 (7th Cir. 2011). Here, there is no evidence that Dana Hewitt or Assistant Superintendent of Operations Sally Stevenson had racial animus towards Plaintiff. However, the evidence taken in the light most favorable to Plaintiff suggests that a reasonable jury could find the materially adverse actions were proximately caused by the discriminatory conduct and allegedly false write-ups of Plaintiff's supervisors and/or the actions and input of Human Resources Director, Joan Cooper. Again, both parties may argue their position regarding employer liability to a trier of fact.

compensation, terms, conditions, or privileges of employment"
because of an employee's race.  See 42 U.S.C. §§ 2000e-2(a)(1).
"Acting 'because of race' means acting with a racially
discriminatory reason in mind." *Brewer v. Board of Trustees of
University of IL*, 479 F.3d 908, 915 (7th Cir. 2007) (citing *Jordan
v. City of Gary*, 396 F.3d 825, 832 (7th Cir. 2005); *Hildebrandt v.
Ill. Dept. of Natural Resources*, 347 F.3d 1014, 1029 (7th Cir.
2003)).  Here, Plaintiff has again chosen to proceed under the
"direct method" of proof; thus, he must present direct or
circumstantial evidence which would "permit a reasonable jury to
conclude that the employer acted with discriminatory intent." *Id.*

Plaintiff uses the evidence described above in his hostile
work environment and retaliation claims (e.g. being made to witness
racially derogatory remarks by his supervisors to African American
inmates, being advised not to date a Caucasian coworker, being
forced to break up large groups of inmates by himself, and being
required to specifically target and harass black inmates) to argue
that a reasonable trier of fact could conclude he was subjected to
racial discrimination.  Plaintiff also points to the "suspicious
timing" of the sudden negative comments in his employee fact file[18]
and disciplinary actions taken against him.  He offers up his
removal from the E-Squad, pointing to the fact that at least one

---

[18] Plaintiff asserts that a negative comment dated November 26, 2007,
referred back to an incident from early November, which leads to the inference
that that specific allegation and all those that followed were manufactured
due to racially discriminatory motives.

similarly situated Caucasian employee forgot his State ID badge on the same day but was not likewise removed. Finally, Plaintiff again refers to the suspicious conduct by the Human Resources Director, Joan Cooper, wherein she did not supply requested paperwork, reschedule the pre-deprivation hearing, or call Plaintiff back.

Defendants argue that these facts are insufficient to establish discrimination under the direct method because there is no evidence that the allegedly discriminatory comments or conduct played any role in the adverse employment actions taken against him. They state that Plaintiff has not shown that the people involved in the employment decisions had any "race-based animosity" towards him, and they point out that a number of intervening factors (such as Plaintiff's one-time failure to carry his State ID badge, his un-excused absences, and his failure to attend the pre-deprivation hearing) "negate an inference of causation" as to his discrimination claims.

The Court has previously addressed Defendants' argument regarding the "intervening factors" listed above. As stated, Plaintiff has put forth sufficient evidence in rebuttal, and those facts will be for a trier of fact to evaluate. In addition, using the same analysis of the facts as applied to the retaliation claims, the Court finds that a reasonable trier of fact could conclude that Defendants acted with discriminatory intent. See

also footnote 17, *supra*.  Again, the Court is not suggesting that Plaintiff's claims have been shown by a preponderance of the evidence; rather, the Court simply finds that the facts presented are enough to allow Plaintiff to survive summary judgment at this stage.

<u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motion for Summary Judgment (DE #21) is **DENIED** and Plaintiff's claims remain pending.

**DATED: September 16, 2011**          **/s/RUDY LOZANO, Judge**
                                       **United States District Court**